FILED

2003 SEP 12 AM 10: 27

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANNY E. BROWN, SYLVESTER BUTLER,       )
KENNETH CAUDILL, SAMMY J. DOUSE,        )
WILLIE ENGLISH, SIDNEY EVERETT,         )
KELVIN FRAZIER, MORRIS J. GILBERT,      )
JIJUAN T. HAGANS, TROY D. HALL,         )
BENJAMIN LAFLOWER, CURT MASSIE,         )
ANTONIO J. McCLOUD, LAMAR A. MIFFIN,    )
MICHAEL L. MONTGOMERY, KUNTA            )
PORTER, ISSAC SHARPE, SAMUEL            )
STROTHER, JEREMIAH THOMAS, EUGENE       )
E. ULRATH, GLENN WHEELER and            )
REGINALD WILLIAMS, individually, and on )
behalf of a Class of all persons similarly situated, )
                                        )
        Plaintiffs,                     )
                                        )
vs.                                     )    CASE NO.   2:03-cv-526-FtM-29DNF
                                        )
JAMES V. CROSBY, Jr., in his official capacity )
as Secretary, Florida Department of Corrections; )    JOHN E. STEELE
GERALD H. ABDUL-WASI, in his official   )    UNITED STATES DISTRICT JUDGE
capacity as Inspector General, Florida Department )
of Corrections; JOSEPH THOMPSON, in his )
official capacity as Warden, Florida State Prison, )
CHESTER LAMBDIN, in his official capacity as )    DOUGLAS N. FRAZIER
Warden, Charlotte Correctional Institution, )    U.S. MAGISTRATE JUDGE
JOSEPH PETROVSKY, in his official capacity as )
Warden, Santa Rosa Correctional Institution, and )
WENDELL WHITEHURST, in his official     )
capacity as Warden, Washington Correctional )
Institution,                            )
                                        )
        Defendants.                     )
_____)

## COMPLAINT

## CLASS ACTION — INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.  Plaintiffs, DANNY E. BROWN, SYLVESTER BUTLER, KENNETH CAUDILL, SAMMY J. DOUSE, WILLIE ENGLISH, SIDNEY EVERETT, KELVIN FRAZIER, MORRIS J. GILBERT, JIJUAN T. HAGANS, TROY D. HALL, BENJAMIN LAFLOWER, CURT MASSIE, ANTONIO J. McCLOUD, LAMAR A. MIFFIN, MICHAEL L. MONTGOMERY, KUNTA PORTER, ISSAC SHARPE, SAMUEL STROTHER, JEREMIAH THOMAS, EUGENE E. ULRATH, GLENN WHEELER and REGINALD WILLIAMS, individually, and on behalf of a Class of all persons similarly situated, all of whom are prisoners in the custody of the Florida Department of Corrections, and all of whom allege they have been the victims of unjustified or excessive use of chemical agents by Florida Department of Corrections employees, seek declaratory and injunctive relief to enforce their right to be free from cruel and unusual punishment, as secured to them by the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.  The defendants have violated Plaintiffs' right to be free from cruel and unusual punishment by using chemical agents, including pepper spray and tear gas, maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

3.  The named Plaintiffs, on behalf of themselves and on behalf of a class of similarly situated individuals, seek a declaratory judgment that the policies, practices and customs of the Defendants concerning the use of chemical agents violate the Eighth and Fourteenth Amendments to the Constitution of the United States of America, and corresponding injunctive

- 2 -

relief requiring the Defendants to cease their unlawful conduct and to implement measures to prevent its continuation.

## JURISDICTION

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 as this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) as this action seeks redress for civil rights violations under 42 U.S.C. § 1983.

5. This Court has jurisdiction over claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

6. The Plaintiffs' claims for attorneys' fees and costs is predicated upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing Plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

## VENUE

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one of the defendants resides in this District and a substantial number of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

8. Plaintiff Danny E. Brown at all times material to this action, and currently, is incarcerated at Santa Rosa Correctional Institution, Santa Rosa County, Florida.

9. Plaintiff Sylvester Butler is currently incarcerated at Columbia Correctional Institution, located in Columbia County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

- 3 -

10. Plaintiff Kenneth Caudill is currently incarcerated at Union Correctional Institution, located in Union County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

11. Plaintiff Sammy J. Douse, at all times material to this action, and currently, is incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

12. Plaintiff Willie English at all times material to this action, and currently, is incarcerated at Florida State Prison in Bradford County, Florida.

13. Plaintiff Sidney Everett is currently incarcerated at Tomoka Correctional Institution, located in Volusia County, Florida. When the events giving rise to his claim arose, he was incarcerated at Washington Correctional Institution, located in Washington County, Florida.

14. Plaintiff Kelvin Frazier is currently incarcerated at Santa Rosa Correctional Institution, located in Santa Rosa County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

15. Plaintiff Morris J. Gilbert is a prisoner currently on out-to-court status. When his court appearance is completed, he will return into the custody of the Florida Department of Corrections. When the events giving rise to his claim arose, he was incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

16. Plaintiff JiJuan T. Hagans is currently incarcerated at Union Correctional Institution, located in Union County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

- 4 -

17.   Plaintiff Troy D. Hall is currently incarcerated at Union Correctional Institution, located in Union County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

18.   Plaintiff Benjamin LaFlower, at all times material to this action, and currently, is incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

19.   Plaintiff Curt Massie is currently incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

20.   Plaintiff Anthony J. McCloud is currently incarcerated at Everglades Correctional Institution, located in Miami-Dade County, Florida. When the events giving rise to his claim arose, he was incarcerated at Washington Correctional Institution, located in Washington County, Florida.

21.   Plaintiff Lamar A. Miffin is currently incarcerated at Florida State Prison, located in Bradford County, Florida. When the events giving rise to his claim arose, he was temporarily at Washington Correctional Institution, located in Washington County, Florida.

22.   Plaintiff Michael L. Montgomery is currently incarcerated at Santa Rosa Correctional Institution, located in Santa Rosa County, Florida. When the events giving rise to his claim arose, he was incarcerated Washington Correctional Institution, located in Washington County, Florida.

23.   Plaintiff Kunta Porter, at all times material to this action, and currently, is incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

24.  Plaintiff Issac Sharpe is a prisoner currently on out-to-court status. When his court appearance is completed, he will return into the custody of the Florida Department of Corrections. When the events giving rise to his claim arose, he was temporarily at Washington Correctional Institution, located in Washington County, Florida.

25.  Plaintiff Samuel Strother, at all times material to this action, and currently, is incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

26.  Plaintiff Jeremiah Thomas is currently incarcerated at Union Correctional Institution, located in Union County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

27.  Plaintiff Eugene E. Ulrath is currently incarcerated at Union Correctional Institution in Union County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

28.  Plaintiff Glenn Wheeler, at all times material to this action, and currently, is incarcerated at Charlotte Correctional Institution, located in Charlotte County, Florida.

29.  Plaintiff Reginald Williams is currently incarcerated at Santa Rosa Correctional Institution, located in Santa Rosa County, Florida. When the events giving rise to his claim arose, he was incarcerated at Florida State Prison, located in Bradford County, Florida.

30.  Defendant James V. Crosby, Jr., is the Secretary of the Florida Department of Corrections. As such, he bears overall responsibility for the operation of all prisons under the supervision and control of the Florida Department of Corrections. He is sued in his official capacity.

- 6 -

31. Defendant Gerald H. Abdul-Wasi is the Inspector General of the Florida Department of Corrections. As such, he has statutory responsibility for investigating complaints of staff misconduct, including the investigation of all reported uses of force by staff, including use of force by way of chemical agents, and reporting the results of his investigations to prison management. He is sued in his official capacity.

32. Defendant Joseph Thompson is the Warden at Florida State Prison. As such, he bears overall responsibility for the operation of the prison, including review and approval or disapproval of use of force incidents, including use of chemical agents. He is sued in his official capacity.

33. Defendant Joseph Petrovsky is the Warden at Santa Rosa Correctional Institution. As such, he bears overall responsibility for the operation of the prison, including review and approval or disapproval of use of force incidents, including use of chemical agents. He is sued in his official capacity.

34. Defendant Wendell Whitehurst is the Warden at Washington Correctional Institution. As such, he bears overall responsibility for the operation of the prison, including review and approval or disapproval of use of force incidents, including use of chemical agents. He is sued in his official capacity.

35. Defendant Chester Lambdin is the Warden at Charlotte Correctional Institution. As such, he bears overall responsibility for the operation of the prison, including review and approval or disapproval of use of force incidents, including use of chemical agents. He is sued in his official capacity.

## CLASS ACTION ALLEGATIONS

36. The named Plaintiffs bring this suit as a class action, pursuant to the provisions of Rule 23(b)(2) of the Federal Rules of Civil Procedure for injunctive and declaratory relief on behalf of a class of all persons similarly situated.

37. The class of Plaintiffs consists of all persons who are:

a. now in, or will hereafter come into, the custody of the Florida Department of Corrections, and

b. now housed, or will hereafter be housed, in any type of segregated housing, including but not limited to Maximum Management, Close Management, Disciplinary Confinement or Administrative Confinement, and

c. have been, or may be in the future, subjected to a non-spontaneous use of force by way of chemical agents used maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline.

38. The Plaintiff class consists of an unknown but large number of inmates, numbering in the many thousands at any given time, so that joinder of all members is impracticable.

39. Controlling issues of law and fact are common to all members of the Plaintiff class in that Florida Department of Corrections employees routinely use chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline.

40. Controlling issues of law and fact are also common to all members of the Plaintiff class in that Florida Department of Corrections supervisory employees routinely participate,

- 8 -

facilitate, encourage, or acquiesce in the behavior of their subordinates and are fully aware that chemical agents are used maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline, and with that knowledge, fail to take any corrective action.

41.   The claims of the individual Plaintiffs are typical of the claims of the members of the Plaintiff class. The named Plaintiffs' right to be free from cruel and unusual punishment has been abridged by the repeated, unjustified, malicious or sadistic use of chemical agents for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline and their rights are likely to be abridged again in the future, contrary to the Eighth Amendment to the United States Constitution.

42.   The named Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff class. The named Plaintiffs have a strong personal interest in the outcome of this action and have no conflicts of interest with members of the Plaintiff class. The named Plaintiffs are all current prisoners who have had chemical agents used on them maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline. As long as the policies, practices and customs of Florida Department of Corrections continue to permit employees to abuse prisoners with chemical agents, the named Plaintiffs, and the class they represent, are and will remain at high risk of being unjustly and/or excessively sprayed with chemical agents.

43.   The named Plaintiffs are represented by experienced counsel who specialize in litigation concerning conditions and practices in prisons and jails.

- 9 -

44. Defendants have acted on grounds generally applicable to the Plaintiff class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole. The defendants' policy, practice and custom of repeated, unjust, arbitrary and excessive use of chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline necessitates injunctive relief directing defendants to cease their practice of permitting employees to abuse inmates with chemical agents and to implement remedial measures.

### GENERAL FACTUAL ALLEGATIONS

45. Employees of the Department of Corrections are authorized to use a variety of types of force where the circumstances warrant, including hands-on physical force, chemical agents, electronic immobilization devices, batons, and specialty munitions, as described in Rule 33-602.210, Florida Administrative Code, promulgated by the Florida Department of Corrections.

46. Rule 33-602.210(14), F.A.C., provides that three types of chemical agents may be used against prisoners: 1. Oleoresin Capsicum (pepper spray), 2. Orthochlorbenzal Malononitrile or Orthochlorobenzylidene Malononitrile (CS tear gas), and 3. Cloroacetophene (CN tear gas).

47. As described in Rule 33-602.210(14), F.A.C., each of these chemical agents causes, and is intended to cause, intense physical pain when applied to human beings. The physical effects described by the Rule are as follows: (a) OC pepper spray "causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress;" (b) CS tear gas "causes eyes to burn and tear, nasal discharge, and skin and upper

respiratory irritation;" and (c) CN tear gas "causes tearing of the eyes, nasal discharge, and skin and upper respiratory irritation."

48.  Despite frequent claims that chemical agents are used without justification or to excess, Defendants have recently begun using a different brand of pepper spray that has a much higher percentage of active pepper.

49.  Rule 33-602.210, F.A.C., includes rules governing both spontaneous and non-spontaneous use of force situations.

50.  A spontaneous use of force involves an immediate need to use force without time for reflection or planning. Plaintiffs' claims do not arise from the spontaneous use of force.

51.  A non-spontaneous use of force is a use of force which occurs after time for reflection and planning by the correctional staff using the force.

52.  Rule 33-602.210(14)(c) specifically authorizes the use of OC pepper spray and CS tear gas under "controlled situations when time constraints are not an issue."

53.  Plaintiffs' claims arise from non-spontaneous uses of force in controlled situations where time constraints are not an issue.

54.  "Controlled conditions" are situations where prisoners are housed in segregation or are otherwise locked down or restrained. Segregated housing includes Administrative Confinement, Disciplinary Confinement, Close Management, and Maximum Management.

55.  Rule 33-602.210(14)(m) authorizes the use of chemical agents in "controlled conditions" when prisoners are "disorderly, disruptive [or] unruly." The Rule requires, however, that before chemical agents can be used, Correctional Officers must first attempt to end the

- 11 -

improper behavior through counseling and verbal orders. If the inmate is not responsive to the

Correctional Officer, then "the confinement or close management lieutenant or shift supervisor"

must attempt to end the improper behavior before chemical agents can be used.

56. Thereafter, Rule 33-602.210(14)(m)(3), provides that:

Prior to using chemical agents, the inmate again shall be counseled with concerning his behavior.

a. If this attempt to counsel with the inmate is unsuccessful, the inmate will be given a final order by staff to cease his actions. The inmate will also be informed at this time that chemical agents will be administered if he continues his disruptive behavior.

b. If the inmate continues his disruptive behavior, approximately three minutes after the order is given, staff are authorized to administer chemical agents in the form of no more than three one-second bursts. Staff are authorized to immediately utilize chemical agents if physical injury to staff or other inmates appears imminent.

c. If after approximately five minutes from the initial exposure the inmate still continues his disruptive behavior, staff are authorized to again administer chemical agents for no more than three one-second bursts.

d. If the second administration of chemical agents fails to control the inmate's disruptive behavior, the duty warden shall again be consulted to determine the next course of action.

57. Rule 33-602.210(14)(c), F.A.C., provides that "[i]n controlled situations when time

constraints are not an issue, chemical agents can only be used if authorized by the warden or duty

warden." Rule 33-602.210(14)(m)(2)(b), F.A.C., also requires that prior to using chemical agents

the warden or duty warden be contacted for "authorization to utilize chemical agents." On

information and belief, Defendants Thompson, Lambdin, Petrovsky, and Whitehurst, do not

independently review or otherwise insure that requests to use chemical agents are consistent with

Rule 33-602.210, F.A.C.

- 12 -

58.   Segregated housing cells have a small opening, called a "food flap," which is controlled by correctional staff. The flap is generally closed and locked except at meal times and at other times when it is necessary to exchange an item with the occupant of the cell.

59.   When correctional staff use chemical agents in a controlled situation on prisoners in segregated housing, the usual process is to unlock the food flap and spray chemical agents into the cell through the opening.

60.   At times, chemical agents are sprayed into a cell by sliding the cell door open a few inches and holding the door in place with a chain around the door to the neighboring cell.

61.   At times, chemical agents are sprayed into a cell from outdoors by using the cell window as the entry point.

62.   On occasion, chemical agents have been sprayed into a cell simultaneously through the cell door and the cell window.

63.   The ventilation system is turned off before chemical agents are used in the segregated housing units. In addition, correctional staff often cover the outside window of the cell with cardboard or plastic bags to further concentrate the impact of the chemical agents.

64.   Florida Department of Corrections policies require that certain actions be taken after chemical agents are used, including quickly removing the prisoner from the contaminated cell, allowing the prisoner to rinse the chemicals off in a cold shower, returning the prisoner to a decontaminated cell and issuing fresh clothes and bed sheets. These actions are routinely ignored, thereby knowingly and intentionally increasing the suffering caused by the use of chemical agents.

- 13 -

65.  Correctional officers often control the water and the water temperature in the segregated housing showers. When prisoners are taken to the shower after being sprayed with chemical agents, the correctional officers sometimes turn the water on for only a few seconds and/or adjust the water temperature to very hot. Hot water, rather than alleviating the effects of the chemical agents, aggravates the situation.

66.  The use of chemical agents has steadily increased since 1999 and currently represents the majority of all use of force incidents within the Florida Department of Corrections. FDOC statistics reveal that chemical agents were used a total of 1,455 times in the year 2000, representing about 40% of all use of force incidents for that year. In the year 2001 this number rose to 1,758, or 46% of all use of force incidents. The use of chemical agents increased again in 2002, to 1,856 incidents, or 54% of all uses of force.

67.  At Florida State Prison, where all inmates are in confinement, chemical agents were used 238 times in 2000, 385 times in 2001, and 447 times in 2002. This represents an 87% increase in the use of chemical agents over this period of time.

68.  At Charlotte Correctional Institution, chemical agents were only used 8 times in 2000 and 10 times in 2001, there was a tenfold increase in 2002 when these weapons were used 80 times.

69.  At Washington Correctional Institution, chemical agents were used 80 times in 2000, 267 times in 2001, and 124 times in 2002. This represents a 234% spike in 2001 and an overall 55% increase over this time period.

70. At Columbia Correctional Institution chemical agents were used 54 times in 2000, 104 times in 2001, and 196 times in 2002. This represents a 262% increase over this time period.

71. At Santa Rosa Correctional Institution chemical agents were used 218 times in 2000, 160 times in 2001, and 271 times in 2002. Overall, this is a 24% increase.

72. Rule 33-602.210(2), F.A.C., provides in part that "All authorized use of force incidents will be videotaped in their entirety." This part of the rule was added after the death of Frank Valdes at Florida State Prison in July 1999. Videotaping was implemented in order to document whether the force used was in fact appropriate and not excessive and to deter the type of physical abuse that resulted in the death of Mr. Valdes.

73. Rule 33-602.210(2), F.A.C., specifically exempts from videotaping "the administration of chemical agents . . . for use on an inmate creating a disturbance in his or her cell when the officer is attempting to resolve the situation without extracting the inmate from the cell." The purpose and intent of this provision is to avoid creating a record that would allow a meaningful review of the use of chemical agents.

74. Rule 33-602.210(6), F.A.C., requires that whenever force is used, "a detailed written report of force used shall be prepared, dated and signed by the initial employee using force."

75. Rule 33-602.210(8), F.A.C., requires the Warden to immediately conduct a preliminary review of all use of force incidents.

76. Rule 33-602.210(8), F.A.C., further requires that information about each use of force be forwarded to the Use of Force Unit within the Office of Inspector General.

77. Rule 33-602.210 requires that all use of force incidents, including use of force by way of chemical agents, be reviewed, and either approved or disapproved, by Defendant Abdul-Wasi.

78. On information and belief, Defendant Abdul-Wasi has approved every non-spontaneous use of force by way of chemical agents which has occurred in a controlled setting at any time after July, 1999.

79. Defendant Abdul-Wasi has failed to make any kind of good-faith investigation of the numerous prisoner claims that correctional officers use chemical agents without justification and to excess.

80. Inmates who believe that they have been the victim of unjustified use of chemical agents can grieve the issue. The grievance process consists of three steps, an informal appeal to the responsible local official, a formal appeal at the prison level, and a formal appeal to the Secretary of the Florida Department of Corrections, the Defendant Crosby.

81. None of the grievances filed by the named Plaintiffs have ever resulted in a finding that chemical agents were used without justification or to excess.

82. On information and belief, none of the grievances filed by class members have ever resulted in a finding that chemical agents were used without justification or to excess.

83. On information and belief, none of the individuals to whom Defendant Crosby has delegated the responsibility for responding to grievances alleging the use of chemical agents without justification or to excess has ever made a meaningful inquiry into the merits of the grievance.

- 16 -

84. Defendants know that allegations of abuse by way of chemical agents are widespread within the Florida Department of Corrections. With that knowledge, Defendants take no action to meaningfully investigate or correct the problem.

85. Despite the widespread complaints of misuse of chemical agents, Defendant Crosby has adopted a policy (Rule 33-602.210(2), F.A.C.), which while requiring that all authorized use of force incidents be videotaped, specifically exempts the non-spontaneous and planned use of chemical agents when directed at an inmate who is in his or her cell.

86. The refusal to require videotaping of non-spontaneous and planned uses of chemical agents, despite widespread complaints of abuse, intentionally precludes any meaningful review of alleged staff misconduct.

87. The rationale offered for not videotaping — that if an inmate saw a camera, the inmate would cease his or her misconduct — is directly contrary to controlling constitutional law, and the requirement of Rule 33-602.210(2), that force is only to be used as a matter of last resort.

88. Despite the widespread allegations that chemical agents are used without justification and to excess, Defendant Crosby has taken no meaningful measures to insure that the actions of the correctional officers using chemical agents are reviewed in a meaningful way and that appropriate corrective action is taken.

89. Defendants know that the number of times chemical agents have been used has increased significantly over the last three years.

- 17 -

90.  As a direct and proximate result of the unjustified or excessive use of chemical agents, maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason, Plaintiffs, and members of the Plaintiff class, have suffered intense physical pain and sometimes serious injuries such as second-degree chemical burns, permanent eye damage, life-threatening asthma attacks, seizures and deterioration of their mental health. These injuries are not limited to the prisoners who are directly sprayed, as all prisoners in the vicinity where chemical agents are used also suffer the adverse affects of exposure.

91.  As a direct and proximate result of the unjustified or excessive use of chemical agents, Plaintiffs, and the members of the Plaintiff class, are psychologically tormented by the constant threats of Correctional Officers that chemical agents will be used on them and by hearing the cries of pain from prisoners in neighboring cells who are sprayed.

## FACTUAL CLAIMS OF THE INDIVIDUAL PLAINTIFFS

### Danny E. Brown

92.  On June 10, 2002, while housed in administrative confinement at Santa Rosa Correctional Institution, Plaintiff Brown declared a psychological emergency. Plaintiff Brown explained to a Psychological Specialist that he was "feeling suicidal and homicidal."

93.  As a result of his declaring a psychological emergency, and explaining his feelings to the Psychological Specialist, Plaintiff Brown was placed on Alternate Medical Housing Cell (AMHC) status, on the recommendation of two psychiatrists, to be observed for potential for self-injury.

94.  On June 10, 2002, Plaintiff Brown was classified as an S-3 inmate. An S-3 inmate is one who, because of a documented history of mental disease or disorder, requires regular access to mental health staff. Plaintiff's history includes depression for which he was treated with psychotropic medicine prior to June 10, 2002.

95.  An inmate is housed on AMHC status for his own protection on account of a potential for suicide or other self-inflicted harmful behavior.

96.  While housed on AMHC status Plaintiff Brown began to hear voices and, in response, began to cover his body with his own feces.

97.  Plaintiff Brown's feces-smeared body was observed by members of the mental health staff and by various Correctional Officers, including two Captains and a Lieutenant.

98.  At about 3:00 p.m. on June 11, 2002, the water to Plaintiff Brown's cell was turned off and the outside window sealed with tape. Shortly thereafter, chemical agents were discharged into Plaintiff's cell.

99.  As the direct and proximate result of the use of chemical agents, Plaintiff Brown suffered an asthma attack, breathing difficulties, and mental and emotional distress. Staff who administered the chemical agent knew that Plaintiff Brown was an asthmatic prior to administering the gas.

100.  Plaintiff Brown did not engage in any type of behavior that justified the use of force, including the use of chemical agents.

101.  No disciplinary action was taken against Plaintiff Brown as a result of the events of June 11, 2002.

- 19 -

102.   Plaintiff Brown grieved the improper use of chemical agents. His Informal Grievance was denied, with the statement that the "use of force was investigated, reviewed and approved by the Inspector General's Office." Plaintiff Brown's formal institutional level grievance contained the same response with the additional statement that "staff are not at fault and appropriately responded to your inappropriate actions." Plaintiff's appeal to Defendant Crosby was denied.

103.   Plaintiff Brown remains at Santa Rosa Correctional Institution, where he is currently assigned to Close Management III status. Because Plaintiff Brown's release date is not until June, 2006, there is a real possibility that he will again be subject to the unjustified use of chemical agents should he again experience mental distress at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Sylvester Butler

104.   Plaintiff Sylvester Butler has a history of psychiatric problems and is borderline developmentally disabled. The use of chemical agents on Plaintiff Butler, as alleged herein, is at least in part, attributable to his psychiatric and developmental problems.

105.   On March 14, 2000 and March 15, 2000, while locked in a Close Management cell at Santa Rosa Correctional Institution, Plaintiff Butler was sprayed with chemical agents multiple times. He suffered second-degree burns on his right shoulder and upper back area as a result of exposure to these chemicals.

- 20 -

106.  On October 3, 2000, while at Florida State Prison, Plaintiff Butler sought medical attention by calling out from his cell to get the attention of the Correctional Officers on duty. There is no intercom system or other means of communicating with the staff assigned to the housing wings at Florida State Prison, other than by calling out. In response to Plaintiff Butler's requests for medical assistance, Captain Chastain and Correctional Officer Reeder turned off the exhaust fans, approached Plaintiff Butler's cell, unlocked the food flap and Reeder began spraying chemical agents into the cell.

107.  Despite Plaintiff Butler's compliance with all orders to cease calling out to correctional staff, Chastain and Reeder returned twice during the next hour and sprayed tear gas into his cell. No warnings were given before chemical agents were used.

108.  Colonel Clark, then the highest ranking Correctional Officer at Florida State Prison, and now an Assistant Warden, authorized the use of chemical agents against Plaintiff Butler with full knowledge that it was being used solely as a means of torture and intimidation.

109.  Neither Correctional Officers Chastain or Reeder, or any other employee of the Florida Department of Corrections, took Plaintiff Butler to the shower so he could rinse off the chemicals.

110.  Correctional Officer Reeder wrote a Use of Force report, falsely stating that force was used because Plaintiff Butler was "beating on his cell door and was refusing all verbal orders from me to cease his disorderly conduct or chemical agents would be administered." He also falsely stated that he used only three 1-second bursts of pepper spray and of tear gas.

111.   In a further attempt to conceal his improper use of chemical agents, Correctional Officer Reeder wrote a disciplinary report charging Plaintiff Butler with disorderly conduct.

112.   Reeder, Chastain and Clark knew that the use of force on Plaintiff Butler was not necessary to maintain or restore order because he was locked in his cell and only asking for medical attention.

113.   Plaintiff Butler developed large, water filled blisters on his hip. The blisters eventually broke and Plaintiff Butler's skin peeled off, leaving his entire hip with a raw, seeping wound.

114.   Plaintiff Butler has exhausted all available administrative remedies regarding the use of chemical agents against him on October 3, 2000.

115.   Plaintiff Butler has been sprayed with chemical agents on at least seventeen (17) separate occasions since February 2000 in retaliation for lawful activities such as calling out from his cell to make requests to staff, for speaking to prisoners in neighboring cells, for filing grievances regarding staff misconduct, and for in-cell conduct that might warrant a disciplinary report but not the use of force.

116.   Plaintiff Butler has also been sprayed with large quantities of chemical agents at Florida State Prison, in situations when he was not disorderly and no use of force was necessary, on April 28, 2000; July 5, 2000; December 8, 2000; January 2, 2001; January 17, 2001; February 6, 2001; March 16, 2001; and August 5, 2001; August 30, 2001; and August 31, 2001.

117.   Plaintiff Butler is currently assigned to Close Management I status at Columbia Correctional Institution. His release date is not until October, 2007, which means there is a

significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Kenneth Caudill

118.  Plaintiff Caudill has epilepsy, which causes such frequent and severe seizures that he must wear a protective helmet at all times. He also has asthma.

119.  Plaintiff Caudill also suffers from a mental illness. His Department of Corrections' doctors recommended in December 2000 that he remain housed in the inpatient psychiatric care unit at Union Correctional Institution for the remainder of his incarceration. However, in April 2002 Plaintiff Caudill was returned to Close Management at Florida State Prison.

120.  On May 13, 2002, Colonel Clark was on the wing supervising the use of chemical agents against other prisoners when Plaintiff Caudill attempted to ask him a question.

121.  Rather than respond to Plaintiff Caudill's inquiry, Clark told Lieutenant Halle to spray Plaintiff Caudill with chemical agents. Without issuing any orders or warnings, Lieutenant Halle sprayed pepper spray and tear gas into Plaintiff Caudill's cell.

122.  As the direct and proximate result of the unjustified use of chemical agents, Plaintiff Caudill suffered seizures and asthma attacks.

123.  In order to cover up the unjustified use of chemical agents, Correctional Officer Travis Baird wrote a Use of Force Report, falsely stating that chemical agents were used because Plaintiff Caudill was creating a disturbance on the wing by kicking and beating on his cell door and yelling obscenities at staff members.

- 23 -

124. On May 14, 2002, Plaintiff Caudill filed a grievance complaining about the improper use of force against him by Clark and Halle. In response, he was told that his complaint had been referred to the Inspector General's office and that he could consider his grievance approved from that standpoint. Plaintiff Caudill was never informed about the outcome of that investigation.

125. Plaintiff Caudill is currently assigned to Close Management I status and is housed in the inpatient mental health unit at Union Correctional Institution. Plaintiff Caudill's release date is not until June, 2006, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Sammy J. Douse

126. Plaintiff Douse is developmentally disabled.

127. Plaintiff Douse has filed a number of grievances complaining about the conditions at Charlotte Correctional Institution and about being mistreated by Charlotte correctional officers.

128. On April 29, 2003, several correctional officers, including Officer Spears, Officer Sinkler and Lieutenant McCarter, responded to Plaintiff Douse's request for additional grievance forms by repeatedly spraying him with chemical agents.

129. In order to cover up this retaliatory and unnecessary use of force, Officer Sinkler wrote a disciplinary report falsely charging Plaintiff Douse with disorderly conduct.

130. As the direct and proximate result of being sprayed with chemical agents, Plaintiff Douse developed a painful chemical burn on his nose.

131. Plaintiff Douse has exhausted his administrative remedies. At all three levels of the grievance process he complained that force had been used against him without provocation and he requested that the surveillance videotape be reviewed to substantiate his claim of abuse. His appeal to Defendant Crosby was denied on May 28, 2003, stating that the subject of his grievance was being reviewed by the investigative section of the Inspector General's office. Plaintiff Douse has not been informed of the outcome of that review.

132. On May 4, 2003, Plaintiff Douse was again sprayed with chemical agents, this time while he was handcuffed and locked in a confinement shower, because he was talking to other inmates who were in the dayroom.

133. As a means of covering up this completely unjustified use of chemical agents, Officer Millard wrote a Use of Force Report and Officer Sullivan wrote a disciplinary report, both falsely stating that Plaintiff Douse was being disorderly and refusing orders to submit to proper restraints.

134. As a direct and proximate result of being sprayed on May 4, 2003, Plaintiff Douse was burned on his right arm and right leg.

135. Plaintiff Douse has exhausted his administrative remedies with regard to the use of chemical agents against him on May 4, 2003. His grievances were denied at all levels and the response to his grievance appeal to Defendant Crosby, dated June 24, 2003, states that the subject of his grievance is under review by Departmental Staff and at the conclusion of that review

- 25 -

"appropriate and necessary action" will be taken. Plaintiff Douse has not been informed of the outcome of the review or of any corrective action taken.

136. In a formal grievance to the medical department, dated May 11, 2003, Plaintiff Douse complained that the medical staff should not have given authorization for him to be sprayed with chemical agents because he is allergic to the chemicals and suffered a burn on his nose. In response, the Regional Medical Director stated, "[t]he medical department does not 'give' approval to security to use chemical agents on any inmate. The use of chemical agent is solely made by security. If in fact the inmate has a condition that may be complicated by the use of chemical agent, security can ask for medical to stand by for emergency assistance if needed."

137. Plaintiff Douse is currently assigned to Close Management I status at Charlotte Correctional Institution. Plaintiff Douse's release date is not until September, 2005, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the us of chemical agents continue.

## **Willie English**

138. Plaintiff English has a history of very serious mental illness and was recently committed to the Correctional Mental Health Institution (CMHI) at Zephyrhills. He has been diagnosed with chronic schizophrenia.

139. On October 24, 2001, while Plaintiff English was silent in his cell at Florida State Prison, several Correctional Officers, including Lindsey, Covey and Lampp gathered outside his door. Sergeant Lindsey unlocked Plaintiff English's food flap, tapped on his window, and said,

"Hey." Without issuing any warnings or orders, Officer Covey began spraying pepper spray into Plaintiff English's cell.

140.  About twenty minutes later Lindsey ordered Plaintiff English to come to the door and asked him if he wanted a shower. Before Plaintiff English could respond, Covey stepped forward and sprayed him in the face, stomach, and groin.

141.  About twenty-five minutes later, Lindsey, Covey and Lampp returned. Without saying anything to Plaintiff English they again used chemical agents.

142.  At the time Lindsey, Lampp and Covey used chemical agents on Plaintiff English, they were aware that he was generally exhibiting signs of psychosis, was in need of mental health care, and that the use of force was not necessary to maintain or restore order because Plaintiff English was quiet and locked in his cell.

143.  Covey wrote a Use of Force Report, falsely stating that chemical agents were used because Plaintiff English was "kicking his cell door and yelling obscenities at staff, and attempting to create a minor disturbance."

144.  Plaintiff English's mental condition deteriorated rapidly after this incident. He was admitted to an inpatient mental health care unit shortly thereafter and eventually committed to the Correctional Mental Health Institution for intensive psychiatric care.

145.  Plaintiff English has been sprayed at Florida State Prison on several other occasions, including October 20, 2000; November 17, 2000; August 20, 2001; and September 19, 2001.

146. Plaintiff English's severe mental illness renders him incapable of writing grievances or articulating complaints about staff misconduct. Therefore, the Department's inmate grievance procedure is not "available" to him within the meaning of the Prison Litigation Reform Act. To the extent that the Prison Litigation Reform Act bars a prisoner from seeking relief in such circumstances, it violates the First, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

147. Although Plaintiff English lacks the ability to make use of the grievance procedure, the unjustified and excessive use of chemical agents was brought to the attention of Defendant Abdul-Wasi in a letter dated November 15, 2002. Defendant Abdul-Wasi took no action in response to the complaint.

148. Plaintiff English is currently assigned to Close Management II status at Florida State Prison. Plaintiff English's release date is not until July, 2009, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Sidney Everett

149. Plaintiff Everett is 62 years old, completely blind, and has prosthetic eyeballs.

150. On June 27, 2001, members of the prison administration and senior security staff, including then Warden Henry Alford, were making rounds in the section of Washington Correctional Institution where Plaintiff Everett was housed.

- 28 -

151. As the prison administrators were walking in front of Plaintiff Everett's cell, Lieutenant Copeland looked in Plaintiff Everett's window and began yelling at him because his bed was not made to Copeland's satisfaction. Without issuing any orders or warnings, Copeland immediately unlocked the food flap in the cell door and began spraying pepper spray into Plaintiff Everett's cell.

152. In pain and confusion, Plaintiff Everett turned his head, hitting it on the side of the top bunk bed in his cell. His head hit with such force that his prosthetic eyes fell out of his eye sockets. The pepper spray got into Plaintiff Everett's eye sockets, causing him excruciating physical pain. His sockets swelled, preventing him from replacing his glass eyes for several weeks.

153. Lieutenant Copeland wrote a Use of Force, falsely stating that Plaintiff Everett had yelled obscenities and refused all orders to stop.

154. Plaintiff Everett did not receive any disciplinary action for his alleged disorderly conduct.

155. Plaintiff Everett has exhausted all available administrative remedies regarding the matters described herein.

156. Plaintiff Everett is currently in open population at Tomoka Correctional Institution. He is serving a life sentence, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of gas continue.

- 29 -

## Kelvin Frazier

157.  Plaintiff Frazier has asthma, a condition that causes inflammation of the lungs and reduced breathing capacity.

158.  On January 4, 2001, Plaintiff Frazier called out from his cell at Florida State Prison to get the attention of correctional officers to request that the officers notify Captain Riggs that Plaintiff Frazier needed to speak to him.

159.  When Captain Riggs arrived at Plaintiff Frazier's cell, he refused to speak with Plaintiff Frazier and, as a means of retaliating for the demands Plaintiff Frazier was making on security staff, instead directed Correctional Officer Reynolds to spray pepper spray into the cell using a canister approximately the size of a fire extinguisher. No orders or warnings were issued to Plaintiff Frazier. Riggs and Reynolds continued to use chemical agents over the course of the next half hour.

160.  The quantity of chemical agents used by Riggs and Reynolds was so great that Plaintiff Frazier was soaking wet, as were the walls, floor, and his personal property.

161.  After exposure to chemical agents, Plaintiff Frazier suffered an asthma attack. Blisters later formed on Plaintiff Frazier's neck and his skin started to peel off. Plaintiff Frazier had second-degree chemical burns on his neck and around his left ear.

162.  In order to cover up the unjustified use of force, Correctional Officer Reynolds wrote a Use of Force Report falsely stating that Plaintiff Frazier was "being loud and disruptive by yelling and kicking on his cell door" and that "he was ordered numerous times to cease his

disruptive conduct, but to no avail." He also falsely stated that he used only three 1-second bursts of both pepper spray and tear gas.

163.   A disciplinary report for disorderly conduct, written to further conceal the unjustified use of force, was overturned on appeal.

164.   On January 11, 2001, Correctional Officer Reeder and Captain Lampp sprayed Plaintiff Frazier with chemical agents in retaliation for the grievances he filed about the previous week's use of force. Plaintiff Frazier received no warnings from defendants before they sprayed chemical agents into his cell.

165.   The chemical agents aggravated the burns on Plaintiff Frazier's neck and also burned his forearms.

166.   Reeder and Lampp were aware that the use of force on Plaintiff Frazier was not necessary to maintain or restore order because Plaintiff Frazier was quiet and locked in his cell.

167.   Reeder wrote a Use of Force Report, falsely stating that he "observed Inmate Frazier beating on his cell door, and [sic] was refusing all verbal orders from me to cease his disorderly conduct or chemical agents would be administered." He also falsely stated that he sprayed only three 1-second bursts of pepper spray.

168.   Plaintiff Frazier received a disciplinary report. It was overturned on appeal.

169.   Plaintiff Frazier has exhausted all available administrative remedies regarding the matters described herein. He filed grievances about both incidents all the way to the Secretary's office, explaining that in each case the use of chemical agents was unjustified. He received the same responses back on both sets of grievances, each stating that his request for action was

denied because the Office of the Inspector General was conducting a review. Plaintiff Frazier

was never notified about the outcome of the Inspector General's review.

170.  Plaintiff Frazier is currently assigned to Close Management II status at Santa Rosa

Correctional Institution. He is serving a life sentence, which means there is a significant

possibility he will again be subject to the unjustified use of chemical agents at some time during

the course of his incarceration if the current policies, practices and customs concerning the use

of chemical agents continue.

### Morris J. Gilbert

171.  On April 24, 2003, Plaintiff Gilbert, while in his cell at Charlotte Correctional

Institution, was repeatedly sprayed with OC pepper spray and CS tear gas as punishment for

allegedly committing an obscene act at an earlier time.

172.  Before chemical agents were used, the officers taped plastic bags over the outside

window of Plaintiff Gilbert's cell to cut off the flow of fresh air into the cell.

173.  In order to cover up their improper use of chemical agents, the officers wrote a Use

of Force report that falsely stated it was necessary to use force because Plaintiff Gilbert refused

an order to submit to handcuffs to be removed from the cell.

174.  No disciplinary action was taken against Plaintiff Gilbert for his alleged failure to

comply with orders to be handcuffed.

175.  Plaintiff Gilbert filed grievances at the informal, formal and appeal levels, reporting

that he had been abused and that the officers had used plastic bags to try to suffocate him, and

requesting that each use of chemical agents be videotaped. At the formal level his grievance was

denied and he received the following response, dated May 23, 2003, "Inspector Charlwood was contacted and advised that when officers administer chemical agent CS they often place the plastic bag on the window to keep it from spreading to the rest of the quad or Dorm. As CS is stronger than OC this is typically done only when using CS. This was not done in an attempt to suffocate you as you claim. Per rule, Video Cameras are not required at uses of force involving chemical agents." His appeal to Defendant Crosby was denied on June 10, 2003, on the basis that the subject of his grievance was already under review by Departmental Staff. Plaintiff Gilbert has not been informed as to the outcome of that review.

176. Plaintiff Gilbert is currently assigned to Close Management I status at Charlotte Correctional Institution, although he is currently on out-to-court status. His release date is not until May, 2011, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### JiJuan T. Hagans

177. Plaintiff Hagans suffers from asthma and has mental health problems related to depression.

178. On June 29, 2000, Plaintiff Hagans stood at his cell door at Florida State Prison watching Colonel Clark and other officers spraying chemical agents into the cell of another inmate. Colonel Clark told Plaintiff Hagans to stop watching and Plaintiff Hagans asked what rule prohibited inmates from looking out their windows into the hallway.

- 33 -

179.   Colonel Clark called for chemical agents to be used on Plaintiff Hagans solely as a means of retaliating against him for verbally questioning an order. Despite Plaintiff Hagans's obvious pain and his pleas for medical help, Colonel Clark continued to spray Plaintiff Hagans until he apologized.

180.   Plaintiff Hagans had an asthma attack after being exposed to the chemical agents.

181.   After being examined by a nurse, Plaintiff Hagans was put back in the same cell where he had been sprayed. He continued to have difficulty breathing and vomited several times.

182.   Five days later, after repeated requests to see a doctor, Plaintiff Hagans was taken to the medical clinic and put on a machine to assist with his breathing. The medical department knew he needed a breathing treatment because they had given him oxygen the previous year after he had been sprayed with chemical agents.

183.   A Use of Force Report was written falsely stating that Plaintiff Hagans was beating and yelling on his cell door and refusing all orders to stop.

184.   Colonel Clark and the Correctional Officers involved were aware that the use of force on Plaintiff Hagans was not necessary to maintain or restore order because Plaintiff Hagans was locked in his cell and was not causing an ongoing disturbance.

185.   Plaintiff Hagans was subsequently sprayed with chemical agents without justification on June 20, 2001, at Florida State Prison and on February 6, 2001 and March 21, 2001 at Union Correctional Institution. He suffered asthma attacks each time he was sprayed.

186.   Plaintiff Hagans has filed numerous grievances complaining that Colonel Clark unjustly targeted him to be sprayed with chemical agents. In a formal grievance dated July 3,

- 34 -

2000, supervisory officials at Florida State Prison told him that his complaint was without merit because chemical agents were necessary to control his "extremely disruptive behavior." In another formal grievance, dated August 4, 2000, wherein Plaintiff Hagans complained that chemical agents should not be used on him because it gives him life-threatening asthma attacks he was told: "It is clearly noted in your record you have asthma, but that would not exclude the use of chemical agents."

187.   Plaintiff Hagans is currently assigned to Close Management II status at Union Correctional Institution. His release date is not until August, 2009, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Troy D. Hall

188.   Plaintiff Troy D. Hall has a history of mental health problems and is currently housed in an inpatient mental health care unit at Union Correctional Institution.

189.   Plaintiff Hall was previously incarcerated at Florida State Prison. He has been transferred to an inpatient mental health care unit at Union Correctional Institution several times, but each time he is discharged he returns to Florida State Prison.

190.   While housed at Florida State Prison, Plaintiff Hall has been sprayed with chemical agents on over thirty (30) occasions in retaliation for lawful activities such as grieving Correctional Officer misconduct, making requests for assistance to staff, talking to other inmates, and for in-cell conduct that might warrant disciplinary action but not the use of force.

- 35 -

191.  One of these occasions was on August 8, 2001, at which time Plaintiff Hall was housed in Maximum Management on Q-Wing. The cells on Q-Wing have two cell doors, an inner door of open bars and an outer door of solid steel. There are no windows in the cells. On August 8th, Plaintiff Hall needed assistance and yelled several times to the officers on the quarterdeck, there being no intercom system or any other means to communicate with the correctional officers.

192.  Instead of assisting Plaintiff Hall or calling a supervisor to speak with him, Lieutenant Halle and Sergeant Perkins responded by spraying Plaintiff Hall with pepper spray and later with tear gas. Each time, they opened the solid steel door to spray the chemicals into the cell and then closed the door to close off all ventilation.

193.  Plaintiff Hall was not given the opportunity to take a shower to wash off the chemical agents.

194.  Correctional Officer Perkins wrote a Use of Force Report, falsely stating that Plaintiff Hall was being disorderly and that he did not comply with several orders to stop.

195.  Plaintiff Hall has been sprayed with chemical agents on so many occasions that he frequently suffers serious nosebleeds when he is exposed to pepper spray and tear gas.

196.  Plaintiff Hall is afraid that he will be arbitrarily sprayed with chemical agents again when he is returned to Close Management.

197.  Plaintiff Hall has exhausted all available administrative remedies regarding the use of chemical agents against him on August 8, 2001.

- 36 -

198.  Plaintiff Hall is currently assigned to Close Management I status and is housed in the inpatient mental health unit at Union Correctional Institution. Plaintiff Hall's release date is not until June, 2004, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Benjamin LaFlower

199.  On April 2, 2003, Plaintiff LaFlower, while in his cell at Charlotte Correctional Institution, was sprayed with chemical agents in retaliation for making a disrespectful comment to Officers Glover and Ronga the previous day. Captain Reid, Sergeant Mathewson, and Sergeant Hicks approached Plaintiff LaFlower's cell and, without issuing any orders or warnings, repeatedly spraying him with chemical agents through the food flap in the cell door. When Plaintiff LaFlower tried to block the chemical agents from coming into his cell, the guards used a long metal bar to push him away from the food flap, cutting his hand.

200.  In order to cover up their retaliatory and unjustified use of force, the officers wrote an incident report and a disciplinary report that falsely accused Plaintiff LaFlower of yelling and banging on his cell door and refusing to stop.

201.  On April 9, 2003, Plaintiff LaFlower reported this incident in an informal grievance and was told that his allegations were being referred to the Inspector General's office and that his grievance was "approved for I.G. reporting purposes only." On June 6, 2003, Plaintiff LaFlower filed another informal grievance because he had never been interviewed by an inspector or been informed of the outcome of the investigation. He was told that based on

medical reports and on the reports of the officers present, it had been determined there was no evidence to support his allegations and no further action was anticipated. The response to his grievance appeal to Defendant Crosby, dated July 8, 2003, states that the subject of his grievance is currently under review by Departmental staff and therefore his request for action is denied.

202.   Plaintiff LaFlower is currently assigned to Close Management I status at Charlotte Correctional Institution. His release date is not until September, 2015, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Curt Massie

203.   Plaintiff Massie is a 41-year-old man diagnosed with Obsessive Compulsive Disorder and Delusional Disorder. At all times material to the Complaint he was taking psychotropic medication to treat his mental illness.

204.   On October 8, 2000, while in his cell at Florida State Prison, Correctional Officers Green and Halle used chemical agents on Plaintiff Massie to punish him for making a funny face behind a nurse's back.

205.   Correctional Officers Green and Halle failed to issue any warnings or orders to Plaintiff Massie before emptying cans of pepper spray and CS tear gas into his locked cell.

206.   To justify the use of chemical agents, Correctional Officer Green wrote a Use of Force Report falsely stating that force was used because Plaintiff Massie had cursed at staff,

- 38 -

screamed threats, and refused several orders to stop. He also falsely stated that he used only three 1-second bursts of both pepper spray and tear gas.

207.   Colonel Clark authorized this use of force with full knowledge that it was unjustified and was done for retaliatory and punitive reasons.

208.   When Plaintiff Massie was taken to the shower, Correctional Officer Green turned the hot water on to intensify the pain Plaintiff Massie was experiencing from the chemical agents.

209.   Defendants failed to give Plaintiff Massie clean sheets for several hours and he was never issued a clean blanket.

210.   Plaintiff Massie suffered second-degree chemical burns that caused large fluid-filled blisters and inflamed skin on his left arm, left leg, back and hip. The blisters on Plaintiff Massie's skin later burst, leaving raw exposed skin. He still experiences pain and burning when his skin is exposed to direct sunlight.

211.   Despite Plaintiff Massie's extreme reaction to chemical agents, employees of the Department of Corrections again authorized and used chemical weapons on him on September 23, 2001.

212.   Plaintiff Massie has exhausted all available administrative remedies regarding the matters described herein. In his grievance appeal to Defendant Crosby he explained that Correctional Officer Green used force against him vindictively and excessively. The response from Defendant Crosby states that the Inspector General's office was reviewing the subject of his grievance and that his request for action was denied.

213. Plaintiff Massie is currently assigned to Close Management II status at Charlotte Correctional Institution. His release date is not until February, 2012, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Antonio J. McCloud

214. For a period of time ending on October 15, 2001, Plaintiff McCloud was housed by himself in a Close Management cell at Washington Correctional Institution on account of need for protection from other inmates.

215. On or about October 15, 2001, Lieutenant Copeland, who on information and belief, made no effort to comply with Rule 33-602.220(4)(a), informed Plaintiff McCloud that he would be getting a cellmate, an inmate by the name of Knox, and demanded that Plaintiff McCloud sign a form accepting the proposed cellmate.

216. Plaintiff McCloud expressed concern over the proposed cellmate, explaining that he and Knox could not get along, and refused to sign the form.

217. Despite the concern expressed by McCloud, and despite his refusal to sign the form which Lieutenant Copeland demanded, Knox was placed in McCloud's cell.

218. On October 15, 2001, when the next shift came on duty, both Plaintiff McCloud and inmate Knox expressed concern over being housed together. As a result, Plaintiff McCloud was moved to a separate cell.

- 40 -

219.  On October 16, 2001, when Defendant Copeland returned to duty and discovered that Plaintiff McCloud and inmate Knox were in separate cells, he arranged for the use of chemical agents on both Plaintiff McCloud and inmate Knox, solely because Plaintiff McCloud and inmate Knox continued to protest being housed together because of protection needs and because both refused to sign the form demanded by Lieutenant Copeland.

220.  Plaintiff McCloud is asthmatic and the use of the chemical agents caused him to experience breathing difficulties.

221.  In response to his informal grievance about the unjustified use of chemical agents, Lieutenant Copeland informed Plaintiff McCloud that "chemical agents were utilized because your disorderly conduct was causing a disturbance and disrupting the normal operations of the housing unit and you refused all orders to cease your disorderly conduct." Copeland's response was made with full knowledge that it was not true and that the only conduct of Plaintiff McCloud was to refuse to sign the form. In response to his grievance to Defendant Crosby, Plaintiff McCloud was informed that the matter had been referred to Defendant Abdul-Wasi for investigation. Plaintiff McCloud has never been advised of the outcome of the investigation.

222.  As a means of covering up the unjustified and unnecessary use of chemical agents, Plaintiff McCloud received a disciplinary report for disorderly conduct.

223.  As the direct and proximate result of the unjustified use of chemical agents, Plaintiff McCloud suffered breathing difficulties and mental and emotional distress.

224.  Plaintiff McCloud is currently assigned to Close Management III status at Everglades Correctional Institution. Because Plaintiff McCloud's release date is not until May,

2026, there is a real possibility that he will again be subject to the unjustified use of chemical

agents at some time during the course of his incarceration if the current policies, practices and

customs concerning the use of chemical agents continue.

### Lamar A. Miffin and Issac Sharpe

225. On September 20, 2001, Plaintiffs Miffin and Sharpe were temporarily moved from

Florida State Prison to Washington Correctional Institution with over thirty other Close

Management inmates. Plaintiff Miffin and Plaintiff Sharpe were taken to Washington

Correctional Institution for mental health evaluations by a Department of Corrections'

psychiatrist in connection with a class action lawsuit filed by the Florida Justice Institute and

Florida Institutional Legal Services challenging the conditions imposed on inmates assigned to

Close Management in Florida.

226. On September 24, 2001, while Plaintiffs Miffin and Sharpe were in full restraints,

consisting of leg irons and handcuffs secured with a black box, and waiting in line with the other

inmates to get on the bus back to Florida State Prison, Lieutenant Copeland and Correctional

Officers Williams and Stoe pulled them out of line and locked them in cages in the visiting park.

227. After Plaintiffs Miffin and Sharpe were locked in the visitation cages, and within

full view of other Florida State Prison inmates, Copeland warned them that they should not be

witnesses against the state. Copeland, Williams and Stoe then proceeded to spray each of them

with two cans of chemical agents at the same time, alternating between Plaintiffs Miffin and

Sharpe several times. At times one officer was spraying in their faces and one was spraying down

their pants.

228.  Lieutenant Copeland wrote Use of Force reports, falsely stating that both Plaintiffs Miffin and Sharpe were being loud and disruptive and refusing all orders to cease.

229.  Neither Plaintiff Miffin or Plaintiff Sharpe received any disciplinary reports as a result of their alleged disruptive behavior.

230.  Although Plaintiffs Miffin and Sharpe were soaked with pepper spray, they were denied a shower, despite their requests to be allowed to shower. Instead, they were forced to sit on the bus for the trip back to Florida State Prison that took between four and five hours.

231.  Plaintiff Sharpe suffers from asthma, a medical condition causing inflammation of the lungs and reduced breathing capacity. As a result of exposure to chemical agents, Plaintiff Sharpe suffered two asthma attacks. He was only able to keep breathing because another inmate loaned him an inhaler used to treat acute asthma attacks.

232.  Plaintiff Miffin experienced pain in his chest and when he arrived at Florida State Prison. An EKG test revealed abnormal results. Two days later, the skin on Plaintiff Miffin's head, neck and upper back began to peel off.

233.  Plaintiffs Miffin and Sharpe have both exhausted all available administrative remedies regarding the matters described herein. Both Plaintiffs Miffin and Sharpe were told by Defendant Crosby that the Office of the Inspector General was reviewing their complaints and because this process was already initiated their request for action was denied. Neither Plaintiffs were ever informed of the outcome of the review.

234.  Plaintiff Sharpe is currently assigned to Close Management II status at Union Correctional Institution, although he is currently on out-to-court status, and Plaintiff Miffin is

currently assigned to Close Management I status at Florida State Prison. Plaintiff Sharpe's release date is not until August, 2009 and Plaintiff Miffin's release date is not until December, 2011, which means there is a significant possibility they will again be subject to the unjustified use of chemical agents at some time during the course of their incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Michael L. Montgomery

235. Prior to February 25, 2002, Plaintiff Montgomery, who was housed in administrative confinement, filed grievances alleging that various senior Correctional Officers at Washington Correctional Institution were engaging in abusive conduct.

236. On February 25, 2002, Lieutenant Copeland arranged for the use of chemical agents on Plaintiff Montgomery, solely as a means to retaliate against Plaintiff Montgomery for Plaintiff's grievance writing.

237. Plaintiff Montgomery, who was only dressed in his boxer shorts when the chemical agents were used, suffered burns to his thighs.

238. To justify the use of the chemical agents, Lieutenant Copeland prepared an Incident Report in which he falsely stated that "Inmate Montgomery was yelling, cursing staff, kicking on his cell door and refused all orders to cease."

239. Plaintiff Montgomery did not receive a disciplinary report for disorderly conduct or any other type of misconduct as a result of the conduct alleged by Lieutenant Copeland in the Incident Report.

240. Plaintiff Montgomery filed an Emergency Grievance to Defendant Crosby, asserting that the use of the chemical agents on February 25, 2002, was retaliation by staff at Washington Correctional Institution for Plaintiff's grievance writing activities. In response, Defendant Crosby advised Plaintiff Montgomery that his grievance was not accepted as an emergency but that the matter was currently under investigation by Departmental Staff and that, since the review began before the grievance, the grievance was denied.

241. The Department Staff review consisted of nothing more than rubber stamp approval of the actions of Lieutenant Copeland.

242. Plaintiff Montgomery is currently assigned to Close Management II status at Santa Rose Correctional Institution. Because Plaintiff Montgomery's release date is not until May, 2005, there is a real possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

243. As the direct and proximate result of the unjustified use of chemical agents, Plaintiff Montgomery suffered burns to his thighs and mental and emotional distress.

### Kunta Porter

244. On May 10, 2003, Plaintiff Porter, while in his cell at Charlotte Correctional Institution, was speaking to other inmates in nearby cells.

245. A few minutes after Plaintiff Porter had stopped talking, Lieutenant Pfalzgraf approached his cell, tapped on the window, and told Plaintiff Porter that he would be back. When

- 45 -

Pfalzgraf returned, he was with Officer Millard. Without issuing any warnings or orders, they sprayed Plaintiff Porter with chemical agents.

246. In an attempt to cover up the unjustified and excessive use of force against Plaintiff Porter, the officers claimed that force was used in response to an ongoing disturbance. Plaintiff Porter was written disciplinary reports for disorderly conduct and for participating in a disturbance. The disciplinary report for disorderly conduct was later overturned.

247. On May 10, 2003, Plaintiff Porter filed an informal grievance reporting that he had been abused with chemical agents and requesting corrective action. In apparent violation of FDOC policy that prohibits the subject of an abuse complaint from answering the grievance, Lieutenant Pfalzgraf responded and falsely stated that "all appropriate actions was [sic] initiated to stop your disruptive behavior. I counsel with you pryor [sic] to the use of chemical agents being applied and appropriate steps were initiated according to policy and procedure of the Department." Plaintiff Porter filed additional grievances and also requested that the surveillance video tape be reviewed to substantiate his allegations. At the formal level he was told that the subject of his grievance was currently being reviewed by the Institutional Inspector and that the request for action was denied. The response to his appeal to Defendant Crosby, dated June 24, 2003, states that the response he received at the institutional level was found to appropriately address his concerns and his appeal was denied. Plaintiff Porter filed another appeal and the response, dated July 7, 2003, denied relief, stating that the subject of his grievance was under review by Departmental Staff and that at the conclusion of that review, appropriate action will be taken. Plaintiff Porter was never informed as to the outcome of any investigation.

248. Plaintiff Porter is currently assigned to Close Management I status at Charlotte Correctional Institution. Plaintiff Porter is serving a life sentence, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Samuel Strother

249. Plaintiff Strother is asthmatic and is prescribed an inhaler to treat this condition.

250. On March 13, 2003, while in his cell at Charlotte Correctional Institution, Plaintiff Strother refused an order to get dressed in his "Class A" prison uniform and to make his bunk.

251. In response to this refusal, Officer Walkuski sprayed him with chemical agents while he was still in his locked cell.

252. As a direct and proximate result of this use of force, Plaintiff Strother suffered an asthma attack.

253. In an attempt to justify this use of chemical agents, Officer Walkuski wrote a Use of Force Report falsely stating that after Plaintiff Strother had refused the order to get dressed in his Class A uniform and make his bunk, Captain Reid had ordered Plaintiff Strother to either comply with CM rules or submit to handcuffs to be removed from the cell for counseling and that Plaintiff Strother had refused.

254. Plaintiff Strother grieved this incident and complained that force was used as an unjustified punishment for his refusal to get dressed in his full uniform and make his bed. His response from Defendant Crosby stated that the subject of his grievance was currently under

- 47 -

review by Departmental Staff and that as this process had already been initiated his request for action was denied. Plaintiff Strother was not informed about the outcome of the Department's review.

255. On April 29, 2003, Plaintiff Strother was again repeatedly sprayed with chemical agents after he questioned an order to put his dirty laundry bag in his locker with his clean clothes.

256. In order to cover up the retaliatory and excessive use of chemical agents, Plaintiff Strother received a Disciplinary Report for disorderly conduct.

257. As a direct and proximate result of chemical agents on April 29, 2003, Plaintiff Strother suffered an asthma attack.

258. Plaintiff Strother filed grievances, complaining that he had been sprayed with chemical agents in retaliation for questioning the order to put his dirty laundry bag in with his clean clothes. The response from Defendant Crosby states that the subject of his grievance was under review by Departmental staff and because that process had already been initiated his request for action was denied. Plaintiff Strother has not been advised as to the outcome of that review.

259. Plaintiff Strother is currently assigned to Close Management I status at Charlotte Correctional Institution. His release date is not until May, 2005, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the us of chemical agents continue.

- 48 -

### Jeremiah Thomas

260.  Plaintiff Thomas is a 31-year-old man with an extensive history of psychiatric problems. He suffers from Schizoaffective Disorder, which causes him to experience auditory hallucinations and bouts of mania during which he does not sleep for days and makes rhythmic noises by talking to himself or banging on his cell walls and door. Since his incarceration in 1991, he has been civilly committed to the Correctional Mental Health Institution (CMHI) several times, frequently admitted for inpatient mental health treatment, and is currently housed in the inpatient Transitional Care Unit at Union Correctional Institution.

261.  Plaintiff Thomas has been diagnosed with asthma, a medical condition that causes inflammation of the lungs and reduced breathing capacity.

262.  In 1998, following one of several commitments to CMHI, Plaintiff Thomas was transferred to Florida State Prison. From late December 1999 through mid-September 2000, Plaintiff Thomas was sprayed with chemical agents on at least nineteen (19) separate occasions. During this same period he had three admissions to the inpatient mental health care unit at Union Correctional Institution.

263.  Following his third admission to the inpatient unit at Union Correctional Institution in the year 2000, Plaintiff Thomas was released on July 13, 2000, and sent back to Close Management at Florida State Prison.

264.  Within a few hours of his arrival back at Florida State Prison on July 13, 2000, security staff sprayed a large quantity of chemical agents into Plaintiff Thomas's locked cell.

Prior to this use of force, Plaintiff Thomas was not misbehaving and had merely asked security for assistance.

265. Plaintiff Thomas was subsequently sprayed with chemical agents on July 18, 20, 21, 23, 26, 2000 and August 3, 2000. During this time period Plaintiff Thomas was suffering symptoms of psychosis and mania that he was unable to control.

266. On September 20, 2000, Correctional Officer Musselman sprayed a large quantity of pepper spray into Plaintiff Thomas's cell without first issuing any orders or warnings. This force was used at the direction of Correctional Officer Anderson and with the authorization of Colonel Clark.

267. In order to cover up the excessive quantity of chemical agents used, Correctional Officer Musselman falsely wrote a report stating that he used only three 1-second bursts of chemical spray.

268. The next day, September 21, 2000, Correctional Officer Wilson sprayed a large amount of pepper spray into Plaintiff Thomas' cell without warning. This was at the direction of Correctional Officer Muse and with the authorization of Colonel Clark.

269. In his Use of Force Report, Correctional Officer Wilson falsely stated that he used only three 1-second bursts of spray.

270. Two days later, September 23, 2000, Correctional Officer Wilson failed to issue any warnings or orders to Plaintiff Thomas before again spraying him with both pepper spray and tear gas. This force was used at the direction of Sergeant Halle and with the authorization of Colonel Clark.

271. Again, Correctional Officer Wilson wrote a false Use of Force Report stating that he had used only three 1-second bursts of both pepper spray and CN tear gas to cover up the fact that he used great quantities of chemical agents that soaked Plaintiff Thomas's entire body.

272. The next day, on September 24, 2000, Correctional Officer Tricocci sprayed Plaintiff Thomas with chemical agents without first issuing any orders or warnings. This force was used at the direction of Captain Chastain and with the authorization of Colonel Clark.

273. In his Use of Force Report, Correctional Officer Tricocci falsely stated that he used only three 1-second bursts of spray on Plaintiff Thomas.

274. During this time period Plaintiff Thomas was experiencing an acute psychiatric breakdown and was in need of mental health care.

275. Plaintiff Thomas was severely burned by the excessive amount of chemical agents used on September 20, 21, 23 and 24, 2000. He had painful blisters and open wounds on his ear and neck, abdomen, left arm, upper back and lower right leg.

276. On September 25, 2000, Assistant Warden Sapp reviewed and approved the multiple uses of force on Plaintiff Thomas from September 20, 21, 23 and 24, 2000. As a result of reviewing these reports, Sapp was aware that Plaintiff Thomas was having symptoms of psychosis and mania and that he had blisters and burns all over his body. Despite this knowledge, Sapp took no action to prevent the further use of force against Plaintiff Thomas or to insure that he received proper mental health treatment.

277. On September 25, 2000, Correctional Officer Barnett sprayed Plaintiff Thomas with chemical agents three separate times without ever issuing any orders or warnings. This force was used at the direction of Captain Chastain and with the authorization of Duty Warden Whitehurst.

278. Defendant Barnett falsified his Use of Force Report to cover up for the grossly excessive quantities of pepper spray, CN tear gas, and CS tear gas he used on Plaintiff Thomas.

279. The following day, September 26, 2000, Correctional Officer Barton sprayed a large amount of pepper spray into Plaintiff Thomas' cell. No orders or warnings were issued beforehand. This force was used at the direction of Captain Lampp and with the authorization of Duty Warden Whitehurst.

280. Defendant Barton wrote a Use of Force Report that falsely stated that he used only three 1-second bursts of chemical spray on Plaintiff Thomas.

281. Each Correctional Officer who was involved in using or authorizing the use of chemical agents against Plaintiff Thomas on September 20, 21, 23, 24, 25 and 26, 2000, knew that Plaintiff Thomas was exhibiting signs of psychosis and was in need of mental health care.

282. Plaintiff Thomas was eventually admitted to the prison infirmary for treatment for his chemical burns and transferred to the Crisis Stabilization Unit at Union Correctional Institution for intensive mental health treatment, where he has remained as an inpatient receiving mental health care for over two years.

283. Because of his history of mental health problems, Plaintiff Thomas is terrified that he will be sprayed again with chemical agents when he returns to a Close Management unit.

- 52 -

284.  Plaintiff Thomas has exhausted all available administrative remedies regarding the matters described herein.

285.  Plaintiff Thomas is currently assigned to Close Management I status, but housed in the inpatient mental health unit at Union Correctional Institution. Plaintiff Thomas' release date is not until January, 2019, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of gas continue.

### Eugene E. Ulrath

286.  On or about October 8, 2002, Plaintiff Ulrath was transferred to Florida State Prison. At the time of the transfer he was classified as an S-3, a mental health classification denoting moderate impairment in the ability to meet the ordinary demands of living within general inmate housing and, generally, periodic administration of psychotropic medication. The day he arrived, Plaintiff Ulrath sought mental health care by declaring a psychological emergency to several members of the security staff and to two different nurses on the wing. Every single one of his requests were ignored and he gave up.

287.  A few hours after his last attempt to declare a psychological emergency, Correctional Officer Shipley repeatedly sprayed Plaintiff Ulrath with pepper spray and tear gas under the supervision of Captain Ellis and with the authorization of Duty Warden Jarvis.

288.  Shipley, Ellis and Jarvis gave no warnings or orders to Plaintiff Ulrath before using chemical agents against him.

289. Correctional Officer Shipley prepared a Use of Force Report, falsely stating that Plaintiff Ulrath was sprayed because he was causing a disturbance on the wing by kicking his cell door and encouraging other inmates to do the same. He further falsely stated that he only used a total of six one-second bursts of pepper spray and three one-second bursts of tear gas.

290. The next day, October 9, 2002, Plaintiff Ulrath was again sprayed with chemical agents without warning. Correctional Officer Lindsey used this force under the supervision of Captain Lampp and with the authorization of Duty Warden Jarvis.

291. In an effort to cover up this unnecessary use of chemical agents, Correctional Officer Lindsey wrote a Use of Force Report, falsely stating that Plaintiff Ulrath was kicking on his cell door and refusing all orders to stop. He also falsely stated that he only used a total of six one-second bursts of pepper spray and three one-second bursts of tear gas.

292. At the time chemical agents were utilized, Shipley, Ellis, Lindsey, Lampp and Jarvis knew that Plaintiff Ulrath suffered from psychological problems.

293. On October 10, 2002, Plaintiff Ulrath attempted to commit suicide by hanging himself with his bed sheet. He was placed in a special suicide observation cell and then transferred to inpatient mental health unit at Union Correctional Institution, where he remains and continues to require inpatient psychiatric treatment.

294. As a result of being exposed to an excessive quantity of chemical agents, Plaintiff Ulrath suffered chemical burns and developed large blisters on his back, buttock and leg.

295. Plaintiff Ulrath has exhausted his administrative remedies. He filed a formal grievance on December 5, 2002, explaining that he was sprayed without warning while lying

quietly in his cell. The response stated that his allegations had been referred to the Inspector General's office for review and to that extent he could consider his grievance approved. His appeal to Defendant Crosby was denied. Plaintiff Ulrath was never informed of the outcome of Defendant Abdul-Wasi's review.

296. Plaintiff Ulrath is currently assigned to Close Management I status and housed in the inpatient mental health unit at Union Correctional Institution. Plaintiff Ulrath's release date is not until August, 2008, which means there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of chemical agents continue.

### Glenn Wheeler

297. On April 22, 2003, while in his cell at Charlotte Correctional Institution, Plaintiff Wheeler spoke to Lieutenant Poccia and requested a property receipt for his radio that had been seized during a cell search. Lieutenant Poccia immediately became angry and told him to get on his bed and shut up. When Plaintiff Wheeler tried to explain his situation, Lieutenant Poccia informed him that he was going to be sprayed with chemical agents.

298. Lieutenant Poccia left to retrieve the canister of chemical agents and returned a few minutes later to spray Plaintiff Wheeler. After additional time had passed, Lieutenant Poccia returned again to spray even more chemical agents into Plaintiff Wheeler's locked cell.

299. As a means of covering up this unnecessary and excessive use of chemical agents, Lieutenant Poccia wrote a disciplinary report charging Plaintiff Wheeler with disorderly conduct.

300.  Plaintiff Wheeler filed grievances at the informal, formal and appeal levels. His appeal to Defendant Crosby, dated May 21, 2003, was denied because the subject of his grievance was already under review by Departmental Staff. Plaintiff Wheeler has not been informed of the outcome of that review.

301.  Plaintiff Wheeler is currently assigned to Close Management I status at Charlotte Correctional Institution. His release date is not until March, 2005, which means there is a significant possibility that he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the us of chemical agents continue.

### Reginald Williams

302.  On October 24, 2001, while Plaintiff Williams was in his cell at Florida State Prison, Correctional Officers Rizer and Reynolds and Captain Riggs sprayed Plaintiff Williams with chemical agents in retaliation for litigation he had filed against prison officials.

303.  Rizer sprayed the chemical agents directly into Plaintiff Williams's face, immediately blinding him and causing intense pain and burning. He could not rinse his eyes out because Rizer continued to spray chemical agents into the cell.

304.  When Plaintiff Williams was finally allowed to shower, Rizer, Reynolds and Riggs intentionally turned on very hot water, which intensified the burning and pain to his skin and eyes.

305.  Correctional Officer Rizer wrote a Use of Force Report, falsely stating that chemical agents were used because Plaintiff Williams was being disorderly and causing a

disturbance on the wing. He also falsely stated that he only used a total of six one-second bursts of pepper spray.

306. In a further effort to cover up this improper use of chemical agents, Plaintiff Williams received a disciplinary report falsely charging that he was participating in a disturbance while inside his cell.

307. As a result of having chemical agents sprayed directly into his eyes, the vision in Plaintiff Williams's right eye has been permanently damaged and he now must wear glasses to see clearly.

308. Plaintiff Williams has exhausted all available administrative remedies regarding the use of chemical agents against him on October 24, 2001.

309. On July 7, 2002 and August 21, 2002, Plaintiff Williams was also sprayed with large quantities of chemical agents while quiet and locked in his cell.

310. Plaintiff Williams is currently assigned to Close Management I status at Santa Rosa Correctional Institution. Because he is serving a life sentence, there is a significant possibility he will again be subject to the unjustified use of chemical agents at some time during the course of his incarceration if the current policies, practices and customs concerning the use of gas continue.

## CAUSE OF ACTION

311. The Eighth Amendment prohibits the use of any force, of any type, by Correctional Officers if the force is used maliciously and sadistically for the very purpose of causing harm and

not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

312. Employees of the Florida Department of Corrections, as alleged in this Complaint, routinely use chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

313. Employees of the Florida Department of Corrections routinely use chemical agents as a means of inflicting corporal punishment on inmates.

314. Employees of the Florida Department of Corrections routinely use chemical agents to punish inmates for past misconduct.

315. Employees of the Florida Department of Corrections routinely use chemical agents on prisoners long after any misconduct has ceased and while the prisoners are quiet and compliant with all orders and where no force is necessary to maintain or restore order.

316. Employees of the Florida Department of Corrections routinely use chemical agents to retaliate for inmates' lawful activities, such as seeking assistance, asking that staff follow the established rules, filing grievances, or otherwise complaining about their conditions of incarceration.

317. Employees of the Florida Department of Corrections routinely use chemical agents in situations where no use of force, of any kind, is necessary.

318. Employees of the Florida Department of Corrections routinely use chemical agents on inmates who suffer from physical disabilities or medical problems that make them especially

vulnerable to serious harm as a result of being sprayed with chemical agents, without taking any precautions to alleviate the extreme health risks posed to these prisoners. Such disabilities and medical conditions include asthma, epilepsy, heart conditions, blindness, and burns from prior chemical agent exposure.

319. Employees of the Florida Department of Corrections routinely use chemical agents on inmates whose apparent misconduct is a direct result of their known mental health problems, including inmates who need immediate mental health services.

320. Employees of the Florida Department of Corrections routinely use chemical agents in dangerous quantities and in amount far more than necessary to control disruptive behavior.

321. The use of force by way of chemical agents, as alleged in this Complaint, is done as a matter of routine, and is permitted and encouraged, in accordance with the established policies, practices and customs of the Florida Department of Corrections.

322. The defendants, and other supervisory employees, routinely violate controlling constitutional standards by participating in, facilitating, encouraging, or acquiescing in the behavior of their subordinates and are fully aware that chemical agents are used maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to maintain or restore discipline, and with that knowledge, fail to take any corrective action.

323. Defendants Thompson, Lambdin, Petrovsky, and Whitehurst, ignore their duty to review requests made by their subordinates to use chemical agents and routinely authorize their use without regard to whether their use is appropriate, pursuant to the terms of Rule 33-602.210, F.A.C. and controlling constitutional law.

324. Defendants Thompson, Lambdin, Petrovsky, and Whitehurst, ignore their duty to review the use of chemical agents after their use to insure that they were used in a manor consistent with Rule 33-602.210, F.A.C. and controlling constitutional law.

325. Defendants Thompson, Lambdin, Petrovsky, and Whitehurst, by failing to meet their responsibilities pursuant to Rule 33-602.210, F.A.C., facilitate, encourage, and acquiesce in the behavior of their subordinates, who routinely use of chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

326. Defendants Crosby and Abdul-Wasi, by failing to meet their responsibilities pursuant to Rule 33-602.210, F.A.C., and the grievance process, facilitate, encourage, and acquiesce in the behavior of their subordinates, who routinely use chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

327. The policies, practices and customs implemented or sanctioned by Defendant Crosby, and other supervisory staff, facilitate and encourage the excessive and unjustified use of chemical agents.

328. Defendants Thompson, Lambdin, Petrovsky, and Whitehurst have the ability to reduce the unjustified and excessive use of chemical agents by a variety of means, including but not limited to: (1) authorizing the use of chemical agents only after personally speaking with the prisoner, (2) supervising the employees responsible for using chemical agents to insure that they

are only used when justified and as a last resort, and (3) disciplining employees that use chemical agents for unlawful reasons.

329.  Defendants Thompson, Lambdin, Petrovsky, and Whitehurst have acted with deliberate indifference to the substantial likelihood that their subordinates will use chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

330.  Defendant Abdul-Wasi is aware of the great increase in the use of chemical agents and the corresponding increase in the number of complaints that chemical agents are being used without justification or to excess. Despite his knowledge, defendant Abdul-Wasi has failed to take even the most basic steps to meet his responsibility to investigate allegations of improper use of chemical agents and to take corrective action.

331.  Defendant Abdul-Wasi, because of his intentional failure to meet his responsibilities, has acted with deliberate indifference to the substantial likelihood that Florida prisoners will be subjected to chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

332.  Defendant Abdul-Wasi has the ability to reduce the unjustified and excessive use of chemical agents by a variety of means, including but not limited to: (1) implementing meaningful investigation protocols to insure that all uses of chemical agents and all allegations of abuse are thoroughly and independently investigated, including but not limited to reviewing all videotapes and interviewing all witnesses in each case, (2) closely monitoring the use of

chemical agents and allegations of abuse to insure that special investigations are triggered when the incidence of use of force and/or abuse complaints increase with regard to particular Florida Department of Corrections institutions or employees, and (3) collecting and preserving evidence.

333.   Defendant Crosby is aware of the great increase in the use of chemical agents and the corresponding increase in the number of complaints that chemical agents are being used without justification or to excess. Despite his knowledge, and despite his responsibility as Secretary of the Florida Department of Corrections, Defendant Crosby has failed to take any steps to meet his responsibility to take those measures within his power and control to insure that his subordinates do not use chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

334.   Defendant Crosby has the ability to end the unjustified and excessive use of chemical agents by a variety of means, including but not limited to: (1) requiring all non-spontaneous uses of chemical agents to be videotaped, (2) abolishing all non-spontaneous uses of chemical agents on S-3 inmates, (3) abolishing all non-spontaneous uses of chemical agents on inmates with medical conditions which increase the risk of harm if chemical agents are used, (4) training staff in the use of techniques to calm inmates who are upset without the need for any kind of force, (5) requiring the use of staff specially trained to defuse confrontations prior to the non-spontaneous use of chemical agents, and (6) adequate and meaningful review and monitoring of all uses of chemical agents.

335. Defendant Crosby, because of his intentional failure to meet his responsibilities, has acted with deliberate indifference to the substantial likelihood that Florida prisoners will be subjected to chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

336. By routinely permitting the use of chemical agents maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason, Defendants violate the rights of the Plaintiffs to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment, made applicable to the States by the Fourteenth Amendment, of the Constitution of the United States.

337. The unjustified or excessive use of chemical agents is so pervasive that there is an extremely high likelihood that the named Plaintiffs and the members of the class will be subject to this unconstitutional practice in the future.

338. Unless enjoined from doing so, Defendants will continue to willfully violate the Eighth Amendment rights of the Plaintiffs and the Plaintiff class. These continuing violations constitute an irreparable injury for which Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs request that this Court:

A. Certify this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

B. Declare that the unjustified and excessive use of chemical agents, as alleged in this Complaint, violates the Eighth and Fourteenth Amendments to the Constitution of the United States.

C. Require the defendants to submit a plan to this Court for approval which will, to the extent possible, prevent chemical agents from being used maliciously and sadistically for the very purpose of causing harm and not in a good-faith effort to restore order or maintain discipline or for any other legitimate penological reason.

D. Require that the plan submitted to the Court for approval make proper provision to prevent chemical agents being used in controlled situations where their use would pose a risk to the mental or physical health of the prisoner.

E. Require that the plan submitted to the Court for approval require that all non-spontaneous uses of chemical agents to be videotaped.

F. Require that the plan submitted to the Court for approval abolish all non-spontaneous uses of chemical agents on S-3 inmates.

G. Require that the plan submitted to the Court for approval abolish all non-spontaneous uses of chemical agents on inmates with medical conditions which increase the risk of harm if chemical agents are used.

H. Require that the plan submitted to the Court for approval include provision for the comprehensive training staff in the use of techniques to calm inmates who are upset without the need for any kind of force.

I. Require that the plan submitted to the Court for approval require the use of staff specially trained to defuse confrontations prior to the non-spontaneous use of chemical agents.

J. Require that the plan submitted to the Court for approval include provision for adequate and meaningful review and monitoring of all uses of chemical agents.

K. Require that the plan submitted to the Court for approval bar the use chemical agents in controlled situations where the prisoner's in-cell misconduct is a result of the mental health status of the prisoner.

L. Require that the plan submitted to the Court for approval bar the use of CS tear gas and CN tear gas in enclosed spaces such as the segregated housing units.

M. Require that the plan submitted to the Court require the implementation of proper decontamination procedures to reduce the pain and chance of injury after exposure to chemical agents, including but not limited to, access to fresh outside air, cold showers lasting at least 15 minutes, the use of specialized skin products designed for chemical decontamination, and ventilation of building with fresh air.

N. Require that the plan submitted to the Court require the use of meaningful de-escalation techniques to insure that chemical agents are truly a last resort, including but not limited to, counseling by mental health staff and high-level supervisors.

O. Enter permanent injunctive relief enjoining the defendants, their successors in office, and their servants, agents and employees, and those acting in concert with them, from

failing to properly supervise, review and investigate the actions of their subordinates when their

subordinates use chemical agents.

P. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Q. Grant Plaintiffs such other and further relief as the Court may deem just and

equitable.

Respectfully submitted,

Lisa White Shirley, Esq.
Christopher M. Jones, Esq.

Florida Institutional Legal Services
1010-B NW 8th Avenue
Gainesville, Florida 32601
352-264-1569
352-271-4366 (Fax)

and

Peter M. Siegel, Esq.
Randall C. Berg, Esq.

Florida Justice Institute, Inc.
2870 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2310
305-358-2081
305-358-0910 (Fax)

Attorneys for Plaintiffs

By:    Lisa White Shirley, Esq.
       Florida Bar No. 478725

and

- 66 -

By:    Peter M. Siegel, Esq.
          Florida Bar No. 227862
          Trial Counsel

Of Counsel
Rhonda Brownstein, Esq.
Southern Poverty Law Center
400 Washington Avenue
Post Office Box 2087
Montgomery, AL 36102-0287
(334) 956-8200
(334) 956-8481 (Fax)